## CRIPPLE CREEK COAL CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 4844.

Circuit Court of Appeals, Seventh Circuit.
March 23, 1933.

Robert Ash, of Washington, D. C., for petitioner.

G. A. Youngquist, Asst. Atty. Gen., Sewall Key and A. H. Conner, Sp. Assts. to the Atty. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, of Washington, D. C., and J. Arthur Adams, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C., of counsel), for respondent.

Before ALSCHULER and EVANS, Circuit Judges, and FITZHENRY, District Judge.

EVANS, Circuit Judge.

The controversy between petitioner and respondent grows out of certain payments made by petitioner which it deducted from its income as "ordinary and necessary expenses." Respondent contends that these payments were made in reduction of a liability and as such were not deductible from petitioner's income. The taxes involved are upon incomes for the years 1922 and 1923.

Petitioner was an Illinois corporation with its principal office in Galesburg. It acquired leases on coal lands near Bryant, Fulton County, Illinois (which lands were about three miles from the tracks of the C. B. & Q. R. R.), for the purpose of supplying the street railways of Minneapolis and St. Paul with "screenings" coal. The Transit Supply Company, a purchasing agent for said street railways, had experienced difficulty in 1917 in securing the necessary coal requirements (which amounted to approximately 300 tons a day) of said street railways and had caused petitioner to be organized to acquire coal leases and mine the coal. Hield, who represented the Transit Supply Company, held the stock of petitioner and was apparently influential with the street car companies. Before coal could be successfully mined and sold, it was necessary to construct a spur track from the C. B. & Q. R. R. to the leased coal lands. It was out of the cost of this spur track and the payments made as a result thereof that this controversy arose.

Petitioner and the railroad company contracted for the construction of the spur track, the estimated cost of which was $90,372. Of this cost the railroad company was to pay $10,000 and petitioner, $24,000 upon the execution of the agreement. The balance ($56,372) was to be paid by petitioner in four equal installments upon demand. Complications and difficulties arose because the actual cost exceeded the estimated cost by $52,955.16. Petitioner originally agreed that should cost exceed estimate, it would promptly be paid. Petitioner was unable, however, to pay the balance of $56,372 in four equal installments, and it was also unable to pay the sum of $52,955.16, the difference between actual and estimated cost.

Numerous agreements were made between the interested parties in an effort to pay the cost of the spur track. It was first agreed (1917) between the railroad company and petitioner that while the latter was to pay the cost of the spur track, the railroad company would allow a rebate of $3 for every car hauled over the track on which the railroad received $15 or more revenue. Immediately upon the execution of this agreement, the Transit Supply Company entered into an agreement to purchase, at cost price f. o. b., all of its coal requirements (about 300 tons a day) from petitioner for fifteen years. Petitioner, in 1919, assigned its right to the $3 per car rebate to the Transit Supply Company for moneys by it advanced to pay the estimated cost of the spur track. It became necessary, however, to change this agreement when the railroad company began applying this $3 rebate to the satisfaction of its claim of $52,955.16, the amount over and above the estimate which the railroad company paid for the construction of the spur track. Petitioner and the Transit Supply Company thereupon entered into another agreement (1921) under which petitioner agreed to pay the Transit Supply Company $3 per car and the Transit Supply Company was to receive the $3 per car rebate after the railroad's claim was extinguished, until the money by it advanced was fully paid. By this 1921 agreement, the assignment to the Transit Supply Company of the obligation of the railroad company to reimburse, included in the contract of 1921, was permitted to stand but was to be reassigned to petitioner when $62,724.02 was paid either by the railroad or by petitioner, the latter's liability being expressly limited to the above amount and its payment, in the manner above described. Under this latter contract, petitioner paid the Transit Supply Company $17,232 in 1922 and $26,817 in 1923.

Looking through the form of the various agreements to the substance and keeping in mind the relationship of the parties who operated, controlled, and managed the street

railway companies, the Transit Supply Company, and petitioner, as well as the purpose and object of the agreements, we reach the conclusion that the $3 payments were all made to satisfy the debt created by the construction of the spur track. The 1919 agreement between petitioner and the Transit Supply Company was for the expressed purpose of repaying the latter company for the moneys advanced by it for petitioner. It is true, this agreement provided that "in no event shall * * * (petitioner) * * * be liable to pay to * * * (Transit Company) * * * any portion of said sum * * * except in the manner and to the extent herein set forth." The $3 per car payments therein provided were, however, merely installment payments in satisfaction of a debt created by the construction of the spur track and which debt the Transit Supply Company satisfied upon petitioner's agreement to repay.

The parties, though no doubt actuated by good faith, entered into the first agreement upon a mutually mistaken assumption respecting the cost of the spur track. When the actual cost became known, new agreements had to be and were made. The additional cost was a direct obligation of the petitioner. Again the latter, unable to advance the cash, was required to pay the amount advanced by another, out of its future business. This sum was fixed, as in the previous agreement, at $3 per car. The amount of the installment and the basis upon which it was computed were, however, unimportant. The significant fact was that it was a payment in extinguishment of an obligation to pay the cost price of the spur track. Inasmuch as the cost price of this track was a capital investment [Colony Coal & Coke Corp. v. Commissioner (C. C. A.) 52 F.(2d) 923; Gauley Mt. Coal Co. v. Commissioner (C. C. A.) 23 F.(2d) 574], all sums paid by petitioner in extinguishment thereof fell under that head rather than "ordinary and necessary expenses."

Petitioner calls attention to and stresses the fact that after its indebtedness for construction of the spur track was extinguished, the payment of the $3 per car did not cease. If this were the only fact to be considered, it would strongly support petitioner's position. However, it must yield to the more persuasive facts disclosed in the foregoing statement.

The agreement between petitioner and the Transit Supply Company, entered into in 1921, stated that its purpose was to carry out more fully the intent of the previous agreement which provided for the assignment of the $3 per car rebates. That agreement was made by the parties when they labored under a mistake as to the cost of the spur track. Inasmuch as the second agreement was merely to carry out the intent of the parties set forth in their first agreement, and was made necessary through this mutual mistake of fact, it is, we think, necessary to read the two agreements together and to find that the assignment of the $3 rebates and the $3 per car additional payments were made for the sole purpose of satisfying a capital obligation for which petitioner alone was liable.

The order of the Board of Tax Appeals is affirmed.